
## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON

| | |
|---|---|
| In the matter of the search of ) | Case No. <u>3:21-mj-00025</u> |
| Attitude Aviation located at ) | |
| TRI-STATE AIRPORT ) | |
| 1433 COUNTY ROUTE 3/1, BUILDING 8 ) | |
| HUNTINGTON, WEST VIRGINIA 25704, ) | Filed under seal |
| And the person of RUTH MARIE PHILLIPS ) | |
| also known as "Marie Phillips" ) | |

### <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT</u>

I, Michael Moyer, Special Agent with the Federal Bureau of Investigation ("FBI"),

Charleston, West Virginia, Field Office, being duly sworn, state the following:

### <u>AFFIANT'S BACKGROUND AND EXPERIENCE</u>

1.     I am a Special Agent with the FBI and have been so employed since January 2016.

Since this time, your Affiant has gained experience in conducting investigations by completing a

twenty-week training course at the FBI Academy in Quantico, Virginia. As part of my training,

I learned how to conduct investigations into criminal activity, to include counterterrorism and

counter-intelligence matters. I have also completed specialized trainings that focus on the

investigation of financial crimes.

2.     As part of my duties as an FBI Special Agent, I investigate criminal violations

relating to mail fraud, wire fraud, bank fraud, and money laundering. I have participated in the

execution of multiple federal search warrants in investigations involving financial crimes. I also

served in specialized investigative positions with the FBI, including fraud. These complex and

large-scale fraud investigations often require the detection of various methods of insurance and

financial fraud and identifying the various applicable state and federal laws that were violated. I

have gained experience in the identification of victims of such crimes, the responsibilities of

identifying the financial loss of the victims, and the necessary process and procedures for successfully recovering their financial losses. Several of these investigations have resulted in criminal prosecutions in the United States District Court in the Southern District of West Virginia.

3. As a Special Agent, I have attended training and seminars that centered on financial investigations, to include the investigation of currency transaction offenses in violation of the Bank Secrecy Act and money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957. I have experience and knowledge of the means and techniques that individuals engaging in criminal activities use to derive, launder, conceal, and spend their illegal profits and use their assets to facilitate unlawful activity.

4. I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. § 641 (theft or embezzlement of federal property); 18 U.S.C. § 666 (theft from a program receiving federal funds); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1956 (laundering in monetary transactions in property derived from specified unlawful activity); and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and I am authorized by law to request a search warrant.

## PURPOSE OF THIS AFFIDAVIT

5. This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the locations specifically described in Attachment A of this Affidavit, including those properties and/or persons listed below (collectively the "SUBJECT PREMISES") for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 641 (theft or embezzlement of federal property); 18 U.S.C. § 666 (theft from a program receiving federal funds); 18 U.S.C. § 1028A (aggravated

identity theft); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1956 (laundering in monetary transactions in property derived from specified unlawful activity); and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), which items are more specifically described in Attachment B of this Affidavit.

    a.  The person of RUTH MARIE PHILLIPS;

    b.  The offices and property of Attitude Aviation, located at the Tri-State Airport, 1433 County Route 3/1, Building 8, Huntington, Wayne County, West Virginia 25704, including any trash containers located therein;

    c.  The content of computers and electronic storage devices located and seized therein; and

    d.  The content of any locked cabinets, containers, drawers, boxes or other receptacles large enough for paper record retention or electronic storage devices located therein;

    e.  The following vehicles which your Affiant expects to be located therein:

        i.  2019 GMC Sierra Denali 4WD Crew Cab, VIN# ▆▆▆▆▆▆▆▆▆

6.    As noted above, this Affidavit is also submitted in support of an application for a search warrant for the person described in Attachment A of this Affidavit, Ruth Marie PHILLIPS ("PHILLIPS"). As set forth herein, there is probable cause to search the person of PHILLIPS, as described in Attachment A, for the items described in Attachment B, including cell phones and digital storage devices such as thumb drives that can be concealed on her person should PHILLIPS be present in the SUBJECT PREMISES. I believe probable cause exists for the issuance of a

warrant to search PHILLIPS, as described in Attachment A, for (1) property that constitutes evidence of a federal criminal offense; (2) contraband, the fruits of a federal crime, or things otherwise criminally possessed; and/or (3) property designated or intended for use or which is or has been used as the means for committing a federal criminal offense, namely 18 U.S.C. § 641 (theft or embezzlement of federal property); 18 U.S.C. § 666 (theft from a program receiving federal funds); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1956 (laundering in monetary transactions in property derived from specified unlawful activity); and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

7.     Moreover, it has been my experience that suspects in these types of fraudulent business activity transport items, property, and contraband via their vehicles and store them inside of those vehicles. I am familiar with past investigations in which computers, documents, storage devices, electronic media, and records were found inside suspects' vehicles. While such evidence can be found in vehicles registered to them, it has also been my experience that these vehicles are not necessarily registered to the person who has control over the vehicle. I therefore request that the warrant authorize officers to search any vehicles that are not registered in PHILLIPS' name but which nevertheless appear to be under her dominion or control and are located at the SUBJECT PREMISES, in addition to the vehicles described above which are registered to her.

8.     From my background and experience, I know that individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, tax returns, escrow files, and other financial documents, in their personal residences and place of business. I am also aware that individuals engaged in illegal activity often possess, either at work or at their personal residences, computers, documents, storage devices, and electronic

4

media used in the commission of the crime and, as set forth below, PHILLIPS has been known to use computers and other electronic devices. Further, from my background and experience, I know that business entities such as Attitude Aviation and their records keepers such as PHILLIPS, normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, tax returns, escrow files, and other financial documents, in their personal residences and places of business.

9.     There are many reasons why individuals and business entities, including criminal offenders and criminal enterprises, maintain evidence for long periods of time. The evidence may be necessary business records which must be kept for information reporting purposes, such as for state and Federal tax returns, and loan applications. The evidence may also appear innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs of vacations or other residences, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but may have real significance and relevance when considered in light of other evidence. The individual or business entity at issue may no longer realize they still possess the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The individual or business entity may also be under the mistaken belief that they or their records keepers have deleted, hidden, or further destroyed any computer-related evidence, but which may actually be retrievable by a trained forensic computer expert as detailed later in this Affidavit.

10.     Through my training and experience, I am aware that the proceeds generated from both legal and illegal activities may be spent many years after the illegal activity has ceased. Thus,

records reflecting income and expenditures for the time period spanning the scheme and associated activity and those years immediately following the end of such activity are also essential to any financial investigation.

11.     The statements in this Affidavit are based in part on information provided by other investigators, state and local law enforcement officers and investigators, witnesses, financial records, as well as my own investigation of this matter. This ongoing investigation is financial in nature, thus, any figures I cite in this Affidavit are based on calculations and tracing conducted to date and may be subject to revision at a later date. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations or attempted violations of 18 U.S.C. § 641 (theft or embezzlement of federal property); 18 U.S.C. § 666 (theft from a program receiving federal funds); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1956 (laundering in monetary transactions in property derived from specified unlawful activity); and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity) are presently located in the SUBJECT PREMISES.

## STATUTORY AUTHORITY

12.     As noted above, this investigation concerns alleged violations of the following:

a.  **18 U.S.C. § 641** prohibits the theft or embezzlement of federal property, including public money.

b.  **18 U.S.C. § 666** prohibits an agent of an organization from knowingly embezzling, stealing, or obtaining by fraud $5,000 or more from an entity that

receives more than $10,000 in federal funding in a twelve-month period.

c. **18 U.S.C. § 1028A** prohibits the knowing transfer, possession, or use, without authority, of a means of identification of another person during and in relation to certain felonies, including violations of 18 U.S.C. § 641.

d. **18 U.S.C. § 1341** prohibits the use of the postal service or commercial interstate carrier to carry out a scheme to defraud.

e. **18 U.S.C. § 1343** prohibits the use of wire, radio, or television communication in interstate or foreign commerce to carry out a scheme to defraud.

f. **18 U.S.C. § 1344** prohibits the execution of a scheme or artifice to defraud a financial institution.

g. **18 U.S.C. § 1956** prohibits conducting a financial transaction with proceeds from a specified unlawful activity to promote the unlawful activity or conceal its proceeds.

h. **18 U.S.C. § 1957** prohibits money transactions involving criminally derived proceeds of a value greater than $10,000.

## DEFINITIONS

13. The following definitions apply to this Affidavit and Attachment B:

a. **"Computer,"** as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

b. **"Computer hardware,"** as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

c. **"Computer passwords"** and **"data security devices,"** as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

d. **"Mobile applications,"** as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, accessing banking information, and transferring monetary funds.

e. A **"Website"** consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

f. A **"storage medium"** is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

g. The terms **"records," "documents,"** and **"materials,"** as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact disks, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital

data files and printouts or readouts from any magnetic, electrical or electronic storage device).

h. **"Financial institution,"** as defined in 18 U.S.C. § 20, is an insured depository institution or credit union with accounts insured by the National Credit Union Share Insurance Fund.

i. The **Federal Deposit Insurance Corporation ("FDIC")** is an independent agency of the United States government that protects loss of insured monetary deposits if an FDIC-insured bank or savings association fails.

j. **"US Bank"** is a financial institution engaged in, among other activities, accepting customer deposits and allowing the withdrawal of currency from customer accounts. US Bank operates branch offices in Gallipolis, Ohio and the Chesapeake, Ohio area, both located in the Southern District of Ohio. US Bank is insured by the FDIC and is a financial institution within the meaning of 31 U.S.C. § 5312.

k. **"City National Bank"** is a financial institution engaged in, among other activities, accepting customer deposits and allowing the withdrawal of currency from customer accounts. City National Bank operates branch offices in multiple locations, including Charleston, West Virginia, located in the Southern District of West Virginia. City National Bank is insured by the FDIC and is a financial institution within the meaning of 31 U.S.C. § 5312.

l. **"Branch Banking & Trust,"** also known as **"BB&T,"** is a financial institution engaged in, among other activities, accepting customer deposits and allowing the withdrawal of currency from customer accounts. BB&T operates branch

offices in both the Southern District of West Virginia and the Southern District of Ohio. BB&T is insured by the FDIC and is a financial institution within the meaning of 31 U.S.C. § 5312. BB&T recently merged with SunTrust Bank ("SunTrust") and the combined bank is now known as Truist Bank ("Truist"). For purposes of this Warrant, Affidavit, and Attachments, your Affiant will refer to this banking entity as "BB&T."

m. **"J.P. Morgan Chase Bank,"** also known as **Chase Bank,"** is a financial institution engaged in, among other activities, accepting customer deposits and allowing the withdrawal of currency from customer accounts. Chase Bank operates branch offices in the Southern District of West Virginia and the Southern District of Ohio. Chase Bank is insured by the FDIC and is a financial institution within the meaning of 31 U.S.C. § 5312.

## BACKGROUND ON RIVER VALLEY CHILD DEVELOPMENT SERVICE ("RVCDS")

14.     S.B., Executive Director of River Valley Child Development Service ("RVCDS"), confirmed that RVCDS is a non-profit organization with offices at 611 7th Avenue, Huntington, West Virginia, within the Southern District of West Virginia. RVCDS was first established in 1971 under the name Region III Child Development Services and later registered with the West Virginia Secretary of State as a non-profit organization on October 23, 1990, using its current name. According to their website, www.rvcds.org, RVCDS provides quality programs, services, and support to children, families, and the early childhood community. RVCDS serves over 12,000 people a year through a variety of regional and statewide programs in West Virginia. These programs include: school age programs located in Cabell County; the Family Child Care Food Program (serving five counties); and the Child Care Resource and Referral Agencies in

11

Huntington, Logan, Charleston, Parkersburg and Clarksburg; West Virginia Birth-to-Three System Regional Administrative Units located in Huntington and Charleston; and the statewide West Virginia Early Childhood Training Connections and Resources. RVCDS has more than 140 full-time employees.

15.     S.B. confirmed that RVCDS receives grant funding from federal and state grantors. These federal and state funds are disbursed to RVCDS through the West Virginia Department of Health and Human Resources ("DHHR") and the Department of Education by paper checks and/or electronic funds transfer ("EFT") and deposited into RVCDS' legitimate operating accounts. S.B. confirmed that RVCDS received the following approximate amounts of federal dollars during the investigative period from DHHR and the Department of Education:

| APPROXIMATE FEDERAL DOLLARS RECEIVED BY RVCDS FROM DHHR AND DEPT. OF EDUCATION, 2013-2020 | |
|---|---|
| Fiscal year ending 6/30/2013 | $5,825,753. |
| Fiscal year ending 6/30/2014 | $6,073,824. |
| Fiscal year ending 6/30/2015 | $5,964,837. |
| Fiscal year ending 6/30/2016 | $6,122,489. |
| Fiscal year ending 6/30/2017 | $7,131,756. |
| Fiscal year ending 6/30/2018 | $8,634,702. |
| Fiscal year ending 6/30/2019 | $9,569,755. |
| Fiscal year ending 6/30/2020 | $9,787,810. |

16.     During the times relevant to the events described in this Warrant and Affidavit, S.B. provided the following information pertaining to authorized RVCDS bank accounts:

   a.  **CHASE BANK ACCOUNTS**: S.B. confirmed that RVCDS maintained bank accounts at Chase Bank to conduct its financial transactions. The authorized RVCDS accounts Chase Bank, which are listed below, had a registered mailing

address of 611 7th Avenue, Suite 300, Huntington, West Virginia, which is where the RVCDS office is located. The Chase accounts are:

i. One checking account: **Chase Account XXXX1677**. This account is used for RVCDS operations. The account is active and was opened and used by RVCDS. Current check signers on this account are S.B., B.H., and C.D. Former check signers on this account were PHILLIPS, S.P., B.T., and R.B.

ii. One checking account: **Chase Account XXXX4307**. This account was used for payroll until it was closed on July 16, 2020. This account was opened by RVCDS. Checks signers for this account, as of the date of its closing were S.B., PHILLIPS, and C.D. Former check signers on this account were S.P., B.T., and R.B.

iii. One checking account: **Chase Account XXXX2486**, referred to as the "Family Day Care account." This account was used in connection with RVCDS's Family Day Care program until the account was closed on or about July 16, 2020. Check signers as of the date the account was closed were S.B., PHILLIPS, and C.D. Former check signers were S.P., B.T., and R.B.

iv. One checking account: **Chase Account XXXX7913**. This account was used by RVCDS until the account was closed on or about July 16, 2020. Check signers as of the date the account was closed were S.B., PHILLIPS, and C.D. Former check signers were S.P., B.T.,

13

and R.B.

v. One savings account: **Chase Account XXXX0585**. This account is active and was used by RVCDS. Current signers on this account are S.B., B.H., and C.D. Former check signers were PHILLIPS, S.P., B.T., and R.B.

vi. One certificate of deposit ("CD"): **Chase Account XXXX7987**. This is an active CD and legitimately opened by RVCDS.

vii. Four RVCDS credit cards legitimately issued to PHILLIPS: **XXXX4389, XXXX8396, XXXX5602, and XXXX8280**. These cards were legitimately issued to PHILLIPS but they are no longer active.

b. **CITY NATIONAL BANK ACCOUNTS**: S.B. confirmed that in 2019, RVCDS began migrating all its financial accounts from Chase Bank to City National Bank. All authorized RVCDS accounts registered at City National Bank have 611 7th Avenue, Huntington, West Virginia, listed as their account mailing addresses. Those accounts include:

i. One checking account: **City Account XXXX6526**. As of the writing of this Affidavit, this account is active. The account was legitimately opened by RVCDS and is used by the nonprofit for operations. Check signers on this account are S.B., C.D., and B.H.

ii. One checking account: **City Account XXXX6534**. This account is active, was legitimately opened, and is used by RVCDS for payroll. Check signers are S.B., C.D., and B.H.

iii. One checking account: **City Account XXXX6542**, referred to as the "Food Program account." As of the writing of this Affidavit, this account is inactive. The account was legitimately opened. Check signers to this account were S.B., C.D., and B.H.

iv. One investment account: **City Account XXXX5005**. This account is active and was legitimately opened by RVCDS. The account is still in use as of the writing of this Affidavit. PHILLIPS' name is still associated with this account.

v. RVCDS also has a line of credit at City National Bank, which currently has a balance of $0.

c. **BB&T ACCOUNTS**: S.B. confirmed that the only account that RVCDS maintains at **BB&T** is a health investment account to pay health care claims. This account is operated by a third-party administrator. The account information lists the mailing address as 611 7th Avenue, Huntington, West Virginia. RVCDS itself does not maintain any authorized accounts at BB&T for its business expenditures.

17.     S.B. confirmed that she recently learned that PHILLIPS opened an account at **BB&T** in the name of RVCDS, **BB&T Account XXXXXX3143**. As of October 2020, this checking account was active. S.B. confirmed that this account was opened without RVCDS' knowledge or approval in 2002. RVCDS itself was unaware this account existed until mid-to-late 2020. RVCDS staff believe that this account was opened by PHILLIPS without authorization from RVCDS management or Board Members.

18.     The signature card for BB&T Account XXXXXX3143 reflects that signatories on this account included PHILLIPS, N.G., and L.A.F. The signature card lists two locations as the registered address for the mailing of bank statements: (1) PHILLIPS' personal Lavalette, West Virginia, home address, where she resided in 2002, and (2) a Lavalette, West Virginia, Post Office box. RVCDS does not have an office in Lavalette. A BB&T Resolution and Agreement for Deposit Account lists the account as being in the name of RVCDS, it is dated April 2, 2002, and it has signatures purportedly from PHILLIPS, N.G., and L.A.F.

**BACKGROUND ON RUTH MARIE PHILLIPS AND HER ROLE WITH RVCDS**

19.     S.B. confirmed that PHILLIPS began her employment with RVCDS on December 1, 1986, as the Director of Business and Finance. PHILLIPS held this role until on or about September 1, 2020. PHILLIPS worked out of the RVCDS office located at 611 7th Avenue, Suite 300, Huntington, West Virginia.

20.     S.B. confirmed that PHILLIPS reported to the Executive Director of RVCDS. N.G. served as Executive Director from 1971 until 1998. C.J. served as Executive Director from 1999 to 2002. C.J. was succeeded by R.B. from 2002 to 2008. S.B. became Executive Director in 2008 and still holds that role as of the drafting of this Affidavit.

21.     PHILLIPS' duties included being responsible for all financial operations of the RVCDS, including budget planning, monitoring, revisions, and grant management, which included applications, grant document execution, as well as grant invoicing and expenditure reports. PHILLIPS also oversaw all compliance of financial expenditures according to OMB guidelines and was responsible for returning unused grant funding to DHHR and other grantors. She also oversaw annual agency audits. PHILLIPS was also responsible for compiling financial reports for agency program directors and sharing the reports with the directors and the Board of Directors,

and preparing and presenting financial statements to the Board of Directors. PHILLIPS also oversaw payroll, purchasing, contracts, bank account reconciliation, and check writing, which required two-signature authorization on each check. Although not a Certified Public Accountant, PHILLIPS also prepared Forms 990 Return of Organization Exempt from Income Taxes for RVCDS. She also worked with outside auditors during annual financial audits of RVCDS. PHILLIPS also was responsible for maintaining accurate accounting records for RVCDS, which included monitoring accounts receivable, creating and submitting invoices, and handling accounts payable functions. Finally, PHILLIPS was also responsible for creating and implementing fiscal and purchasing policies and procedures agencywide, as well as hiring and supervising administrative support staff in her department.

22.     S.B. stated once the mail was delivered to the RVCDS office, it was handled by the administrative staff. If any checks were received in the mail, they were usually delivered directly to PHILLIPS, and S.B. rarely saw any checks.

23.     Due to the nature of her work, PHILLIPS had access to the accounting system and software used by RVCDS, and she would handle the posting of the income and expenditures into the system.

24.     According to S.B., another employee, K.W., who worked under PHILLIPS, also had access to the accounting system and would do postings and bank reconciliations. S.B. stated that K.W. quit RVCDS shortly after PHILLIPS was terminated. K.W. advised RVCDS staff that she did not want to stay without PHILLIPS, because PHILLIPS would not be "there to have [her] back."

25.     S.B. confirmed that PHILLIPS supervised RVCDS' administrative support staff, which consisted of two accounting assistants (one for accounts receivable and one for accounts

payable), a purchasing agent, and an administrative secretary.

26.    S.B. confirmed that she was PHILLIPS' supervisor from 2008 to 2020, when PHILLIPS was terminated. S.B. admitted that she did not thoroughly review work done by PHILLIPS. S.B. stated that nobody at RVCDS reviewed work done by PHILLIPS, including financial reports, unless they were presented at meetings. PHILLIPS had a history of missing due dates and turning in financial reports late.

27.    S.B. confirmed PHILLIPS received a salary at RVCDS. PHILLIPS received no additional substantial compensation from RVCDS beyond her salary and benefits. PHILLIPS' yearly gross wages as reflected on her IRS Forms W2 from RVCDS are reflected in the table below:

| YEARLY GROSS WAGES FOR RUTH MARIE PHILLIPS, 2002-2019 | |
| --- | --- |
| 2019 | $70,119.31 |
| 2018 | $67,092.89 |
| 2017 | $66,111.09 |
| 2016 | $50,979.25 |
| 2015 | $45,697.50 |
| 2014 | $45,901.31 |
| 2013 | $46,184.59 |
| 2012 | $44,165.67 |
| 2011 | $43,056.85 |
| 2010 | $42,645.35 |
| 2009 | $44,333.19 |
| 2008 | $42,957.05 |
| 2007 | $42,136.24 |
| 2006 | $38,884.47 |
| 2005 | $38,501.42 |
| 2004 | $35,989.29 |
| 2003 | $36,351.12 |
| 2002 | $36,164.53 |

28.    S.B. confirmed that from 2002 through current times, she was not aware of RVCDS ever contracting with or utilizing PHILLIPS in any personal capacity beyond her job, which would be compensated through RVCDS funds. Further, S.B. confirmed that she was not aware of RVCDS ever contracting with or utilizing services from Attitude Aviation which would be compensated or paid for by RVCDS funds.

29.    Between in or about April 2019 to in or about June 2019, PHILLIPS neglected to pay RVCDS payroll taxes, health insurance, and retirement benefits. S.B. advised she was unaware of the nonpayment.

    a.    On or about June 19, 2019, an employee informed S.B. that RVCDS health insurance had been severed. When S.B. asked PHILLIPS about this, PHILLIPS admitted that she had been late in payments and blamed "cash flow" problems within RVCDS as the reason it was not timely paid. PHILLIPS often told S.B. that RVCDS had "cash flow" problems and could not pay for things, but PHILLIPS would follow up by claiming that she would take care of the situation.

    b.    On or about June 20, 2019, another employee informed S.B. that retirement contributions had not been made for two consecutive months.

30.    As a result of the June 2019 issues and additional performance failures, including failing to promptly open and respond to certain mailings in a timely manner, RVCDS placed PHILLIPS on a Performance Improvement Plan ("PIP"), which she received on or about August 12, 2019.

31.    As part of the PIP, PHILLIPS was asked to provide regular financial statements to RVCDS, because, historically PHILLIPS was not forthcoming with the RVCDS financial

statements. PHILLIPS was solely responsible for preparing the financial statements and distributing them to the Board of Directors and the program managers. PHILLIPS was supposed to prepare financial statements every other month, but in 2020, she only provided statements at two Board meetings. PHILLIPS also failed to provide regular RVCDS cash flow reports to S.B. and the other managers.

32.    Throughout 2020, PHILLIPS failed to improve on the PIP and, as a result, she was terminated in or about August 2020. At the time PHILLIPS was terminated, the staff at RVCDS did not have any knowledge about the embezzlement perpetrated by PHILLIPS. On or about August 5, 2020, RVCDS sent PHILLIPS a certified letter advising her that her employment with RVCDS would terminate on September 1, 2020.

33.    S.B. advised that PHILLIPS would often work at night or on weekends on RVCDS-related work, and that she often worked remotely from her Chesapeake, Ohio, residence. S.B. recalled that staff observed PHILLIPS come into the RVCDS office, get files and paperwork, and take it with her out of the office. S.B. further noted that PHILLIPS often conducted her remote work on her own personal home computer, prior to 2020, when PHILLIPS was given an RVCDS-issued laptop. S.B. also stated that PHILLIPS did not have an RVCDS-issued work phone, and instead used her personal cell phone for RVCDS-related work. S.B. noted that PHILLIPS even refused to be compensated for any costs incurred for her personal cell phone usage to conduct work on behalf of RVCDS.

**BACKGROUND ON ATTITUDE AVIATION, INC.**

34.    Attitude Aviation, Inc. ("Attitude Aviation") is a business entity set up by PHILLIPS, her son, T.W.P., and at least one other individual, in 2002. Attitude Aviation is a full-service fixed base operator authorized to provide aeronautical services, such as fueling, rental of

hanger space, aircraft rental, flight instruction and maintenance serving Ohio, West Virginia, and Kentucky. Attitude Aviation operates at two locations – (1) Lawrence County Airpark located at 9654 County Road 1, South Point, Lawrence County, Ohio 45680; and (2) Tri-State Airport located at 1433 County Route 3/1, Huntington, Wayne County, West Virginia 25704.

35.     **Attitude Aviation, Inc.,** was registered with the West Virginia Secretary of State on May 19, 2011, as a for-profit foreign corporation. N.W. is listed as the President, PHILLIPS is listed as the Secretary and Treasurer, T.W.P. is listed as the Vice President. This business entity has not updated its filing or filed an annual report since 2018.

36.     **Attitude Aviation of West Virginia, L.L.C.,** is a domestic for-profit company for transportation, warehousing, and nonscheduled air transportation.  It was registered with the West Virginia Secretary of State on or about May 3, 2012. PHILLIPS is listed as the Manager of the Attitude Aviation of West Virginia, LLC. This business entity has not updated its filing or filed an annual report since 2018.

37.     **Attitude Aviation, Inc.,** registered with the Ohio Secretary of State as a for-profit domestic corporation on or about December 24, 2001. It provided a registration address of 9654 County Road 1, South Point, Ohio. The incorporators for Attitude Aviation in Ohio are listed as PHILLIPS, N.W., and T.W.P.

38.     The website for Attitude Aviation, http://attitude-aviation.com/, states, "Attitude Aviation is a Full Service FBO serving Ohio, West Virginia, and Kentucky. We offer Flight Training, Maintenance Services, Airplane Rentals, and More!" As shown in the image below, as of March 17, 2021, the main landing page for Attitude Aviation displays this description.



The image above shows the top of the main landing page for the Attitude Aviation website, http://attitude-aviation.com.

39.     As seen in the image below, the website for Attitude Aviation, http://attitude-aviation.com, lists two locations for the business, as of March 17, 2021.



a. The first location is listed as "Ohio Location" and lists "Lawrence Cty. Airpark." A hyperlink inserted in that location name takes the viewer to a Google Maps webpage that displays the address "9654 Co Rd 1, South Point, OH 45680" and lists Attitude Aviation as the associated business. This is also the address for the Lawrence County Airpark.

b. The second location is listed as "Tri-State Airport." As seen in the image below, as of March 17, 2021, a special note on the main landing page of the Attitude Aviation website, http://attitude-aviation.com, announces that the business has added a "new location" – the Tri-State Airport in Huntington. The address provided for this second location is 1433 Airport Road, Hanger 8, Huntington, WV.



40.     **Lawrence County Airpark** serves the local Huntington, West Virginia, and Chesapeake, Ohio, area. It is a public use airport located near Chesapeake, Lawrence County, Ohio. It is publicly owned by the Lawrence County Board of Commissioners. The airport is across the Ohio River from Huntington, West Virginia. Airnav.com, which regularly updates airport information based on current FAA records, lists the managers of the Lawrence County Airpark as N.W. and PHILLIPS.

41.     The **Tri-State Airport** is a public airport in Wayne County, West Virginia, United States, near Huntington, West Virginia. The airport is owned by the Tri-State Airport Authority and serves the "tri-state region" encompassing Huntington; Ashland, Kentucky; and Ironton, Ohio.

42.     FAA documents reflect that in August 2004, Attitude Aviation purchased a 1975 Cessna 172M, bearing tail number **N9731H**, from Aircraft Sales Inc., an entity that listed a Massillon, Ohio address. The Cessna 172M is a fixed wing single engine aircraft with four seats It appears that N.W. registered this Cessna 172M with the FAA in August 2004. In the registration paperwork, N.W. listed himself as President of Attitude Aviation. This Cessna 172M was subsequently purchased by PHILLIPS in 2005. PHILLIPS sold this Cessna 172M to herself and a second woman, jointly, later in 2005. In or around mid-2018, FAA documents show PHILLIPS and the second woman sold the Cessna 172M to PHILLIPS. On or about June 5, 2018, this Cessna 172M was registered by N.W. to Attitude Aviation and has a current registration address of 9654 County Road 1, South Point, Ohio 45680 – this is also the address of Attitude Aviation at the Lawrence County Airpark.

43.     The Attitude Aviation fleet includes the following aircraft. Where available, your Affiant has included photographs of the aircraft obtained from the publicly accessible Attitude

Aviation Facebook page located at https://www.facebook.com/Attitude-Aviation-251874611518459:

    a. A 1975 Beechcraft Bonanza F33A with tail number **N2HJ**, serial number CE-542 (seen in the image below), with a current FAA registration as of March 17, 2021. This aircraft is registered to Attitude Aviation at 9654 County Road 1, South Point, Ohio 45680. This aircraft was purchased by Attitude Aviation in or around 2003 for an approximate price of $108,000. PHILLIPS' signature is on the loan agreement with Universal FCU to pay for the purchase of this aircraft.



    b. A 1994 Beechcraft Bonanza A36 with tail number **N109EA**, serial number E-2897 (seen in the image below), with a current FAA registration as of March 17, 2021. This aircraft is registered to Attitude Aviation at 9654 County Road 1, South Point, Ohio 45680. This aircraft was purchased by Attitude Aviation in or around 2012 for around $239,483.98. PHILLIPS' signature is on the loan agreement with Universal FCU to pay for the purchase of this aircraft.



c. A 1974 Cessna 414 with tail number **N483JF**, serial number 414-0537 (seen in the image below). This aircraft was previously registered to Attitude Aviation at 9654 County Road 1, South Point, Ohio 45680. This aircraft was recently sold by Attitude Aviation in or around late 2020.



d. A 1974 Cessna 172M with tail number **N1868V**, serial number 17263775 (seen in the image below), with an FAA registration that expired on January 31, 2021. Prior to the FAA registration expiration, this aircraft was registered to

Attitude Aviation at 9654 County Road 1, South Point, Ohio 45680. Attitude Aviation purchased this aircraft in or around 2010.



e. A 1957 Aeronca 7BCM with tail number **N6478C**, serial number 47-1066, with a current FAA registration as of March 17, 2021. This aircraft is registered to Attitude Aviation at 9654 County Road 1, South Point, Ohio 45680. Attitude Aviation purchased this aircraft in or around 2006.

f. A 1971 Cessna 172L with tail number **N7640G**, serial number 17259340, with an FAA registration that expired on January 31, 2021. Prior to the FAA registration expiration, this aircraft was registered to Attitude Aviation at 9654 County Road 1, South Point, Ohio 45680. Attitude Aviation purchased this aircraft in or around 2007.

g. A 1964 Cessna 310I with tail number **N8054M**, serial number 310I0054 (seen in the image below). This aircraft is registered to Attitude Aviation at 9654 County Road 1, South Point, Ohio 45680. PHILLIPS' signature is on the 2020 FAA registration paperwork and she lists her position with Attitude Aviation as "Sec/Treas." This aircraft was purchased by Attitude Aviation in or around

2003. PHILLIPS' and N.W.'s signatures are on the loan agreement with Universal FCU for $90,000 to pay for the purchase of this aircraft. On the loan agreement, PHILLIPS lists her title as "Director."



    h. A 1975 Cessna 172M, bearing tail number **N9731H**, serial number 17266339, with a current FAA registration as of March 17, 2021. This aircraft is registered to Attitude Aviation at 9654 County Road 1, South Point, Ohio 45680. This aircraft's history is further described above in the preceding paragraph.

44.    In 2016, a total of $692,725.44 was deposited into Attitude Aviation's US Bank Account XXXX0637. Of the total deposits, $526,500.00 is attributable to funds that PHILLIPS wrongfully diverted and embezzled from RVCDS. The amount of deposit funds attributable to other income sources for Attitude Aviation in 2016 is $149,028.80. There was an additional $17,196.64 deposited from a line of credit. For 2016, the embezzled funds from RVCDS accounted for 76 percent of the total deposits, while other, likely legitimate, income accounted for only 21.51 percent of the total deposits. Transfers from the line of credit accounted for 2.48 percent.

45.     In 2017, a total of $906,521.35 was deposited into Attitude Aviation's US Bank Account XXXX0637. Of the total deposits, $690,000.00 is attributable to funds that PHILLIPS wrongfully diverted and embezzled from RVCDS. The amount of deposit funds attributable to other income sources for Attitude Aviation for 2017 is $205,121.35. There was an additional $11,400.00 deposited from a line of credit. For 2017, the embezzled funds from RVCDS accounted for 76.12 percent of the total deposits, while other, likely legitimate, income only accounted for 22.63 percent of the total deposits. Transfers from the line of credit accounted for 1.26 percent.

46.     On or about March 17, 2021, an investigator visited the offices of Attitude Aviation at the Tri-State Airport in West Virginia. The investigator observed that above a door in the office was a name plate that read "MARIE PHILLIPS." The investigator spoke with a mechanic who stated he has worked at Attitude Aviation for approximately twenty years. The mechanic advised the investigator that the company also has a shop in Lawrence County, Ohio. The mechanic stated that Attitude Aviation has two hangers at the Tri-State Airport. The first hanger houses a Cessna 310 and Cessna 172; the second hanger houses a V-Tail Bonanza aircraft.

**BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE TO SEARCH THE PROPERTY DESCRIBED IN ATTACHMENT A AND TO SEIZE THE PROPERTY DESCRIBED IN ATTACHMENT B**

47.     From in or about 2002 through in or about August 2020, PHILLIPS engaged in a scheme to embezzle over four and a half million dollars from RVCDS. Although the embezzlement scheme covered the period 2002 to in or about August 2020, the total amount of money embezzled by PHILLIPS is not currently known, due to records not being available at this time. The approximately $4.7 million that PHILLIPS embezzled only covers the period of late-2013 through in or about August 2020. Based upon the information obtained from witnesses, bank records, and

additional sources listed above, your Affiant has probable cause to believe that since at least 2002, PHILLIPS orchestrated an embezzlement scheme to wrongfully divert funds from RVCDS and laundered the proceeds of that scheme using her unauthorized and undisclosed bank account at BB&T that bore the name of RVCDS, in violation of several federal criminal statutes, including: 18 U.S.C. § 641 (theft or embezzlement of federal property); 18 U.S.C. § 666 (theft from a program receiving federal funds); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1956 (laundering in monetary transactions in property derived from specified unlawful activity); and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

48.     In or about April 2002, PHILLIPS opened **BB&T Account XXXXXX3143** ("BB&T Account XXXXXX3143") under the name "River Valley Child Development Services" and using RVCDS' actual Federal Employer Identification Number on the paperwork to open the account. PHILLIPS opened and operated this account without the knowledge, authority, or permission of RVCDS. PHILLIPS listed herself, N.G., and L.A.F. as check signers. However, administrators of River Valley Child Development Services believe that nobody at the entity was aware of the existence of this BB&T bank account. In fact, N.G. retired from RVCDS in 1998 and L.A.F. retired from RVCDS in 1994.

49.     Although the mailing and registration addresses for RVCDS' operational, authorized bank accounts is the RVCDS business address of 611 7th Avenue, Huntington, West Virginia, when PHILLIPS opened BB&T Account XXXXXX3143, she listed her personal home address and a PO Box in her town as the registered mailing addresses for the account:

   a.   From in or about 2002 through in or about 2005, PHILLIPS used her residential address, located at **5227 Mays Branch Road, Lavalette, West Virginia**, as the

registrant and mailing address for the BB&T account that she opened in the name of RVCDS.

b. In 2006, PHILLIPS moved to Ohio and updated BB&T Account XXXXXX3143's mailing address to reflect her personal residence of ███ ████████████ 1483, Chesapeake, Ohio. PHILLIPS maintained this Ohio address as the mailing address for the BB&T account from in or about 2006 through now, as BB&T Account XXXXXX3143 is still an active bank account. As of the drafting of this Affidavit, PHILLIPS still resides at this Ohio address.

c. At all relevant times to the offenses being investigated herein BB&T Account XXXXXX3143 was registered under the name of River Valley Child Development Services.

50.     PHILLIPS used BB&T Account XXXXXX3143 to divert and deposit business income checks from RVCDS' legitimate accounts at Chase and City National Banks for her own benefit. PHILLIPS moved funds to BB&T Account XXXXXX3143 by creating and issuing false invoices in RVCDS' accounting records. These invoices were made payable to RVCDS and charged for, among other items, conference-related services such as room rental, speaker fees, etc. However, these expenses were not actually incurred or were duplicative of expenses that had been already paid elsewhere. PHILLIPS would then issue checks payable to RVCDS from RVCDS' actual Chase operating account, Chase Account XXXX1677, and, after 2019, RVCDS's City National Bank operating account, City Account XXXX6526. Those checks often varied between $50,000 and $75,000 per check, and at times went as high as $121,032.84. These checks were marked "for deposit only" and often the memo line read, "Indirect Costs." PHILLIPS would then deposit the check issued from Chase Account XXXX1677 and City Account XXXX6526 into

BB&T Account XXXXXX3143. Based upon the transactions reviewed to date, this pattern of transfers occurred multiple times each month for many years since at least December 2013.

51.     Specifically, from in or around December 2013 through in or around 2018, PHILLIPS issued checks payable to RVCDS, drawn from RVCDS' legitimate Chase Account XXXX1677. Those checks were subsequently deposited into BB&T Account XXXXXX3143. This occurred regularly, several times each month. Below is an example of a single invoice check in the amount of $60,816.42 from Chase Account XXXX1677 that was issued to cover "Indirect Costs" and the deposit slip showing the same check being deposited into BB&T Account XXXXXX3143.





52.     Further, from in or about 2019 through 2020, PHILLIPS issued checks payable to RVCDS, drawn from RVCDS' legitimate City Account XXXX6526. Those checks were subsequently deposited into BB&T Account XXXXXX3143. This occurred regularly, several times each month. Below is an example of a single invoice check in the amount of $84,685.76 from City Account XXXX6526 that was issued to cover "Indirect Costs" and the despoit slip showing the same check being deposited into BB&T Account XXXXXX3143.





53. After depositing the checks from the RVCDS Chase and City National Bank accounts into BB&T Account XXXXXX3143, PHILLIPS would then issue checks directly to herself and to Attitude Aviation from BB&T Account XXXXXX3143.

    a. PHILLIPS often wrote checks in the amounts of $5500, $6500, or $7500 per check to "R M PHILLIPS" (PHILLIPS' full name is Ruth Marie PHILLIPS) from BB&T Account XXXXXX3143 and the memo line of many of the checks read "Cont. Svs."

    b. PHILLIPS also frequently issued checks to Attitude Aviation, Inc. in the amounts of $5500, $6500, or $7500 per check from this same BB&T account and the memo line of many of the checks read "Cont. Svs."

54. After PHILLIPS was terminated in or around August 2020, RVCDS hired K.L. in November 2020 as Interim Comptroller. K.L. has been a Certified Public Accountant for approximately thirty years. Prior to working with RVCDS, she worked for Hayflich CPAs PLLC. Upon reviewing the accounting records belonging to RVCDS, K.L. discovered that every account needed to be adjusted because, among other items, payments were not properly made to

government agencies for payroll taxes, bank reconciliations had not been prepared, and payroll benefits were not recorded.

55.    K.L. also advised that PHILLIPS had not coded accounting items properly and provided the following examples: building maintenance coded to technical services, grants were coded incorrectly, items were not expensed but instead were placed on the balance sheet as prepaid taxes, and items were recorded in incorrect periods.

56.    K.L. stated that during her review of the financial records, she discovered that bank reconciliations were a year behind; and that RVCDS had issued itself many checks for indirect costs that either did not exist or had been paid off elsewhere. K.L. discovered eight checks totaling $510,427.22 that concerned her. These eight checks were issued from RVCDS' Chase Account XXXX1677 and City Account XXXX6526. Seven checks were signed by PHILLIPS and included a stamped signature bearing S.B's name. S.B. reviewed the signatures on these checks and stated that she did not recall signing them and that the signatures are consistent with her signature stamp, which PHILLIPS was able to access during her employment. Each of the checks were endorsed with "For Deposit Only River Valley Child Development Services."

57.    K.L. stated that she was able to trace deposits of the checks to BB&T Account XXXXXX3143 —which until then was completely unknown to RVCDS. Bank statements for BB&T Account XXXXXX3143 reflected deposits of multiple checks payable to RVCDS and disbursements by check from that BB&T account to Attitude Aviation and PHILLIPS. These disbursements to PHILLIPS and Attitude Aviation were in the amount of $5,500 or $7,500. These outgoing checks to PHILLIPS and Attitude Aviation bore purported signatures from N.G., L.A.F., and M.J.G.

a.    N.G. was Executive Director of RVCDS from 1971 until she retired in 1998.

N.G. died in April 2019.

    b.   L.A.F. was Assistant Director of RVCDS until she retired in 1994.

    c.   M.J.G. was an Assistant Director of RVCDS and a program director at RVCDS.

       M.J.G. retired in 1995.

   58.    As seen in the images below, disbursement checks from BB&T Account XXXXXX3143 to PHILLIPS and to Attitude Aviation were written from a series of checks printed bearing the name RIVER VALLEY CHILD DEV SERVICES but which listed the address as PHILLIPS' residential address: "▇▇▇ TWP. ROAD 1483, CHESAPEAKE, OH 45619."

59.     Records pertaining to BB&T Account XXXXXX3143 were analyzed for the period December 2013 to August of 2020. Those records show that from at least December 2013 through August 2020, funds wrongfully diverted from legitimate RVCDS bank accounts into the BB&T account totaled approximately $4.7 million.

60.     The following checks are a sampling of checks issued from BB&T Account XXXXXX3143 without authorization or knowledge of RVCDS:

| Check Number | Date | Payable To | Amount |
|---|---|---|---|
| 2392 | 12/6/13 | Attitude Aviation Inc. | $5,500 |
| 2393 | Undated | Attitude Aviation Inc. | $5,500 |
| 2395 | 12/11/13 | R. M. Phillips | $7,500 |
| 3047 | 4/26/20 | Attitude Aviation Inc. | $7,500 |
| 3048 | 4/27/20 | Attitude Aviation Inc. | $7,500 |
| 3049 | 4/27/20 | Attitude Aviation Inc. | $7,500 |
| 3050 | 4/28/20 | Attitude Aviation Inc. | $7,500 |
| 3051 | 4/28/20 | Attitude Aviation Inc. | $7,500 |
| 3052 | 4/29/20 | Attitude Aviation Inc. | $7,500 |

61.     The following are examples of financial transactions that PHILLIPS conducted from her private Chase Account XXX5595, using the proceeds of the embezzlement scheme, in violation of 18 U.S.C. § 1957.

| Check # | Date | Amount | Payee | Memo or Misc. Notes on Check |
|---|---|---|---|---|
| 9097 | 11/14/2013 | $ 17,325.00 | E.S. | Lexus RX350 |
| 9148 | 1/31/2014 | $ 19,205.50 | C&O Motors | Lexus |
| 9455 | 9/9/2015 | $ 11,059.24 | Universal Federal Credit Union | |
| 9711 | 5/23/2017 | $ 16,650.53 | Advantage Toyota | TP Truck |
| 9736 | 7/8/2017 | $ 16,500.00 | E.S. | |
| 9789 | 12/18/2017 | $ 15,000.00 | Three Buds Floral & Boutique | Renovations |
| 9813 | 1/17/2018 | $ 34,000.00 | RVCDS | |

| 9951 | 6/16/2018 | $ 15,000.00 | RVCDS | Loan |
|------|-----------|-------------|-------|------|
| Withdrawal | 7/5/2018 | $ 194,566.67 | Vogel & Cromwell | |
| 9910 | 7/16/2018 | $ 15,000.00 | Three Buds Floral & Boutique | Cooler |
| 10128 | 7/14/2020 | $ 11,933.53 | Keaton's Collision Center | Auto Repair |

62. The following are examples of financial transactions that PHILLIPS conducted from the business account of Attitude Aviation, US Bank Account XXXX0637, using the proceeds of the embezzlement scheme, in violation of 18 U.S.C. § 1957.

| Check # | Date | Amount | Payee | Memo or Misc. Notes on Check |
|---------|------|--------|-------|------------------------------|
| 5876 | 12/18/2017 | $ 15,00.00 | Three Buds Floral & Boutique | Pmt #2 - Renovations |
| Cashiers Check 9236507374 | 1/3/2018 | $ 150,476.00 | R.F. | Purpose M.O. |
| 5974 | 6/3/2018 | $ 100,000.00 | Ruth Marie Phillips | To purchase N9731H |
| 5996 | 7/24/2018 | $ 15,000.00 | Ruth M. Phillips | W/D of Equity |

63. A review of the "Indirect Costs" checks written on Chase Account XXXX1677 and City Account XXXX6526 showed a signature bearing S.B.'s name. However, in an interview conducted with S.B. on February 25, 2021, she denied signing the checks, and further stated that it appears that her signature stamp was utilized to provide her signature on the checks. S.B. confirmed that PHILLIPS had access to S.B.'s signature stamp. According to S.B., the only people besides herself that had access to her signature stamp were PHILLIPS and K.W. Further, S.B. stated her signature stamp was only to be used with her permission and in her absence.

64.    The table below shows the total amounts, per year, of the checks diverting RVCDS

funds from its legitimate bank accounts to BB&T Account XXXXXX3143. The total amount of

RVCDS funds wrongfully diverted to BB&T Account XXXXXX3143 is: $4,721,731.46.

| CHECK TOTALS, BY YEAR, DEPOSITED INTO BB&T ACCOUNT XXXXXX3143 | |
| --- | --- |
| YEAR | AMOUNT DEPOSITED |
| 2013 (partial) | $ 50,593.08 |
| 2014 | $ 805,698.55 |
| 2015 | $ 658,498.21 |
| 2016 | $ 736,587.24 |
| 2017 | $ 960,077.64 |
| 2018 | $ 695,830.61 |
| 2019 | $ 426,716.31 |
| 2020 (partial) | $ 387,729.82 |
| TOTAL: $ 4,721,731.46 | |

65.    When asked in her interview about the "indirect costs" appearing on many of the

checks used to divert funds from authorized RVCDS bank accounts to BB&T Account

XXXXXX3143, S.B. stated RVCDS could use around fifteen percent of grants to cover indirect

costs, such as administrative expenses. Furthermore, S.B. stated she never sees the accounting

software but believes the "indirect costs" should have been handled using a journal entry and

would not require the issuance of a check. S.B. stated she had not seen the checks written for

"indirect costs" until they were shown to her after the embezzlement was discovered.

66.    From in or about December 2013 through in or about 2020, PHILLIPS issued

checks payable to herself from BB&T Account XXXXXX3143. The table below shows the total

amounts per year of the checks written payable to "R M Phillips" from BB&T Account

XXXXXX3143. The total amount of funds PHILLIPS issued to herself from BB&T Account

XXXXXX3143 is $1,142,500.00.

| CHECK TOTALS PAYABLE TO PHILLIPS AS ISSUED FROM BB&T ACCOUNT XXXXXX3143 | |
|---|---|
| YEAR | AMOUNT DEPOSITED |
| 2014 | $ 208,500.00 |
| 2015 | $ 164,000.00 |
| 2016 | $ 204,000.00 |
| 2017 | $ 185,500.00 |
| 2018 | $ 146,000.00 |
| 2019 | $ 136,500.00 |
| 2020 (partial) | $ 98,000.00 |
| TOTAL: $ 1,142,500.00 | |

67.     From in or about December 2013 through on or about August 13, 2020, PHILLIPS issued checks from BB&T Account XXXXXX3143 that were made payable to "Attitude Aviation Inc." and "Attitude Aviation." The table below shows total amounts, per year, of the checks written payable to Attitude Aviation and Attitude Aviation Inc. The total amount of funds issued to Attitude Aviation and Attitude Aviation, Inc., from BB&T Account XXXXXX3143 is $3,395,500.00. S.B. confirmed in her February 25, 2021, interview that RVCDS had never done any business with Attitude Aviation, Inc.

| CHECK TOTALS PAYABLE TO "ATTITUDE AVIATION" AND "ATTITUDE AVIATION, INC." AS ISSUED FROM BB&T ACCOUNT XXXXXX3143 | |
|---|---|
| YEAR | AMOUNT DEPOSITED |
| 2013 (partial) | $ 18,500.00 |
| 2014 | $ 407,500.00 |
| 2015 | $ 490,000.00 |
| 2016 | $ 538,500.00 |
| 2017 | $ 690,000.00 |
| 2018 | $ 601,500.00 |
| 2019 | $ 318,000.00 |
| 2020 (partial) | $ 331,500.00 |
| TOTAL: $ 3,395,500.00 | |

68.     S.B. told investigators that there were two checks associated with PHILLIPS that were previously brought to S.B.'s attention during an audit: one for $15,000 and one for $10,000. The auditor and S.B. questioned those checks and PHILLIPS advised she had wanted to make an anonymous donation to RVCDS. PHILLIPS was told by S.B. that was not acceptable, and PHILLIPS maintained that she wanted the donations to be anonymous.

69.     Bank records indeed show one check in the amount of $15,000.00, which was written from PHILLIPS' private Chase checking account, XXXX5595, and payable to RVCDS. Bank records also show one check in the amount of $10,000, written from Attitude Aviation's US Bank account, XXXX0637, and payable to RVCDS. Both checks are shown below.

70. S.B. was asked if the money from these checks was returned to PHILLIPS and she stated that the money had been kept by RVCDS. S.B. further stated that she was not aware of any loans made by RVCDS to PHILLIPS or received by RVCDS from PHILLIPS.

71. During the period of April 2019 to June 2019, when PHILLIPS had not paid various services at RVCDS such as payroll taxes, vision or health insurance, or retirement benefits, she diverted the following amounts of money from RVCDS' City Account XXXX6526 to BB&T Account XXXXXX3143:

| FUNDS DIVERTED FROM RVCDS CITY NATIONAL BANK TO BB&T ACCOUNT XXXXXX3143 APRIL – JUNE 2019 | |
|---|---|
| **MONTH** | **AMOUNT PER DEPOSIT** |
| April 2019 | $70,799.75 |
| May 2019 | $300 (cash in) |
| June 2019 | $70,799.75 |

During that same period, April to June 2019, PHILLIPS issued herself (using the name "R M Phillips) a total of approximately $32,500 and issued Attitude Aviation, Inc., (writing both Attitude Aviation and Attitude Aviation Inc.) approximately $74,000. It should be noted that checks for Attitude Aviation and Attitude Aviation, Inc. were deposited into Attitude Aviation's US Bank Account XXXX0637.

72. When asked about the hardships caused to RVCDS as a result of PHILLIPS' embezzlement through the wrongful diversion of RVCDS funds, S.B. stated that RVCDS was forced to close two childcare centers in the Huntington, West Virginia area over the last seven years, because PHILLIPS told her that there was not sufficient funding to keep the centers open. S.B. recalled that prior to closure, both childcare centers were at or near full capacity. S.B. recalled that PHILLIPS told her that one of the centers was approximately $100,000.00 in debt, and that

the other center was approximately $200,000.00 in debt. As a result, RVCDS closed the first childcare center in 2013 and the second center in 2016.

### EXPENDITURE OF FUNDS BY RUTH MARIE PHILLIPS DURING THE COURSE OF THE EMBEZZLEMENT SCHEME

73.    PHILLIPS made the following vehicle purchases during the period of the scheme, from in or about 2002 to in or about August 2020. Although your Affiant knows the scheme operated since opening BB&T Account XXXXXX3143 in 2002, financial information for purposes of this Affidavit only covers late-2013 through August 2020. Financial information prior to late-2013 has not been reviewed at this time.

a.    On or about **September 21, 2019** – a **2019 GMC Sierra Denali 4WD Crew Cab** pickup truck for $66,281.40. PHILLIPS purchased this vehicle from Moses Auto Mall of Huntington, WV. The total price of this vehicle (after rebates) was $66,281.40. There was no apparent trade-in on this transaction. PHILLIPS paid for this vehicle with two checks drawn on Attitude Aviation Inc.'s US Bank Account XXXX0637. Check number 6270 was dated September 21, 2019, for $44,512.35 and payable to Moses Auto Mall with "Purchase company vehicle" written in the memo line of the check, although it is titled in PHILLIPS' name. Check number 6271 was also dated September 21, 2019, for $21,769.14, and payable to Moses Auto Mall with "Company Vehicle-2" written in the memo line of the check. There was no lien on this vehicle purchase.

b.    On or about **April 27, 2016** – a **2016 Lexus RX 350 SUV**. The total cash price was $56,167.67. PHILLIPS wrote a personal check drawn on her Chase bank account ending in -5595, for $10,000 for the down payment and a trade-in

43

allowance of $20,769.00 for a unpaid balance of $25,398.67. This vehicle was purchased at Moses Lexus in St. Albans, West Virginia, and was financed at Huntington National Bank.

c. On or about **February 24, 2014** – a **2013 Lexus 5 Door Sport Sedan**. After a trade-in, PHILLIPS paid the remaining balance of $19,205.50.

d. On or about **January 10, 2014** – a **2007 Essex**.

e. On or about **March 5, 2014** – a **2014 Cadillac SRX**. PHILLIPS financed a balance of $41,433.13. This was paid off in full in 2017. PHILLIPS reported her income on the 2014 loan application as being in excess of $89,000 but the only employer she listed was RVCDS. It appears that title to this vehicle recently transferred to another individual.

f. On or about **November 23, 2013** – a **2009 Lexus**.

g. On or about **September 8, 2012** – a **2001 Chevrolet Corvette**. This vehicle was purchased for approximately $16,000.

74. Based upon my investigation, I have determined that PHILLIPS engaged in the following suspicious land transaction activities during the period of the scheme:

a. On or about **June 13, 2018** – PHILLIPS, along with her son, T.W.P., purchased property at Smith Mountain Lake in Franklin County, Virginia. Said property is known as Lot 2, Boardview Estates, as referenced in Deed Book 921, pages 1994-97. Said property has a street address purportedly of ████████████, **Wirtz, Virginia 24184**. The consideration paid for this property was $695,000.

   i. On or about **July 3, 2018** – PHILLIPS, along with T.W.P., took out a loan at J. P. Morgan Chase Bank for $400,000 on the Smith

44

Mountain Lake property detailed above.

    ii.    At this time, your Affiant does not know the source of the $295,000 down payment on this property.

b.    On or about **July 22, 2005** - Lawrence County, Ohio Clerk's Office Deed Book 361 pages 468-69 records that PHILLIPS purchased **Lot 5 of the Bethel Place Subdivision**, Union Township, Lawrence County, Ohio. The consideration paid for this property was $185,000.

    i.    The Lawrence County, Ohio Clerk's Office Trust Deed Book 361, pages 71-473, records that on or about **July 26, 2005**, PHILLIPS took out a **loan** on the property described above in sub-section b for $145,500 at Universal Federal Credit Union.

    ii.    The Lawrence County, Ohio Clerk's Office Release of Trust Deed Book 1061, page 51, records that on or about **October 29, 2020**, PHILLIPS **paid off the $145,000 loan** at Universal Federal Credit Union, just after her termination from RVCDS.

c.    The Randolph County, West Virginia, Clerk's Office Deed Book 461, pages 465-66 records that on or about **July 29, 1998**, PHILLIPS purchased **Lot 51, High Mountain Corporation**, "Thunderstruck Section" containing 5.61 acres in Randolph County, WV; and Lot 52, High Mountain Corporation, "Thunderstruck Section" containing 6.96 acres from H.D. and E.D. The consideration paid for this property was $42,000.00.

    i.    The Randolph County, West Virginia, Clerk's Office Trust Deed Book 293, pages 89-92 records that PHILLIPS took out a loan on

this property for $33,600.00. H.D. and E.D. financed the sale of this property described above, being lot numbers 51 and 52.

ii. The Randolph County, West Virginia, Clerk's Office Deed Book 461, pages 581-84 records that on or about **August 26, 1998,** PHILLIPS transferred Lot 51, High Mountain Corporation, "Thunderstruck Section" containing 5.61 acres in Randolph County, West Virginia; and Lot 52, High Mountain Corporation, "Thunderstruck Section" containing 6.96 acres in Randolph County, West Virginia, to PHILLIPS and T.W.P. with no consideration.

iii. The Randolph County, West Virginia, Clerk's Office Deed Book 456, pages 405-09, records that on or about **January 26, 1998,** T.P. and PHILLIPS, husband and wife, purchased Tract Number 53, "Thunderstruck Section" of High Mountain Corporation from J.E. and W.E. for $150,000.

iv. The Randolph County, West Virginia, Clerk's Office Trust Deed Book 285, pages 435-38, records that on or about **January 26, 1998,** T.P. and PHILLIPS took out a loan against Tract Number 53, "Thunderstruck Section" of High Mountain Corporation. This loan was for $140,000.00. This loan was from J.E. and N.E.

v. The Randolph County, West Virginia, Clerk's Office Release of Lien Book 132, page 31, dated **May 4, 2009**, reflects that the above loan as referenced in sub-section (iv) was paid in full on

this date and the lien was released. As reflected above, in 2009, PHILLIPS' gross wages for her work at RVCDS were $44,333.19.

## AFFIANT BACKGROUND ON FRAUDULENT BUSINESS INVESTIGATIONS

75.    As a Special Agent with the FBI, your Affiant has had training and experience in the investigation of fraudulent business practices. Based upon my training, experience, and knowledge, I am aware of the following:

    a.  During the normal operation of a business, business records are created. Business records are vital to the day-to-day operations of a business; they are used to obtain financing and in the preparation of tax returns.

    b.  Individuals involved in illegal activities oftentimes willfully and knowingly misclassify personal expenditures as business expenditures and fail to report these expenditures as taxable income on their personal income tax returns.

    c.  Business owners and business recordkeepers such as those who are responsible for accounting and finances, can often falsify financial books and records to conceal and hide sources of taxable income, particularly where there is little to no oversight.

    d.  Company shareholders, owners, and officers can illegally skim money from their companies by having the company pay personal expenses and also deduct these personal expenses on the corporate tax returns. By doing this, these owners, shareholders, and officers understate the taxable income (for corporations) and ordinary income (for S corporations) and understate the taxable income the officers, shareholders, and owners report on their Forms

47

1040.

e. Monetary instruments, such as checkbooks, money orders, and cashier's checks, utilized by individuals engaged in illegal activities such as embezzlement or Ponzi schemes are oftentimes secured in safe-deposits, locked drawers, and lock boxes.

f. Individuals involved in other illegal activities oftentimes place income and assets in the name of nominees, in hopes of shifting the responsibility for the payment of tax and concealing their ownership to protect the assets from seizure. However, it is also my experience that the titles and deeds to said assets are maintained by the subject and not the nominee owner.

g. Analysis of business and personal financial records created and maintained by legal and illegal business entities can determine the validity of the books and records and provide leads to the expenditure of illegal or wrongfully obtained proceeds.

h. Business entities generally require that specific business and personal financial records be maintained for use in applying for loans at financial institutions, for tax preparation, and for audit purposes. These records are commonly stored for lengthy periods of time at residences, at business offices, in vehicles and other storage facilities.

i. Records can be stored in paper format or in digital form. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of

documents. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person and can store digital copies of records. Smartphones and other smart electronic devices also often have access to online banking accounts through mobile applications or web browsers. These accounts are often utilized to maintain the business records of expenses and income.

j.  The Internet affords individuals several different venues for obtaining, completing, and storing business records.

  i.  Individuals also use online resources to retrieve and store records. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of records may be found on the user's computer, smartphone, or external media in some cases.

  ii.  A digital technology related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use

such apps to engage in banking activity, money transfers, bill payments, and engage in other financial related activities.

k. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for purposes of maintaining records. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

l. Paper copies, or hard copies, of business and personal financial records can also be stored in file cabinets, desk drawers, cabinets, safes and safe-deposit boxes, lock boxes, wallets, purses and handbags, garbage bags, cardboard boxes, and other storage containers large enough for paper retention.

m. Individuals engaged in conspiracies to commit other crimes often communicate with one another as well as with unwitting accomplices. These communications can occur in many forms including person to person, telephonic, text messages and electronic such as email. These communications typically involve details pertaining to the scheme, directions to subordinates as to how to carry out certain elements of the scheme and correspondence to and

from unwitting third parties such as financial institutions, investors, and accountants.

n. Individuals involved in criminal endeavors conduct financial transactions in a manner to avoid law enforcement detection. These individuals exchange currency for various types of monetary instruments including postal money orders, cryptocurrencies, and bank cashiers' checks and, thereby, attempt to disguise and conceal their true business and personal affairs.

o. To accurately reconstruct the personal and business financial histories of persons and their various businesses, all forms of business and personal records reflective of financial transactions are required.

76. Your Affiant has no reason to believe that the search is likely to result in the seizure of any drafts of publications (such as books, newsletters, website postings, etc.) that are unrelated to the search and stored on the target computers. Thus, the search will not implicate the Privacy Protection Act, 42 U.S.C. § 2000aa. I have no reason to believe that the search is likely to result in the seizure of a mail server. Thus, the search will not implicate the Electronic Communications Privacy Act, 18 U.S.C. § 2701.

77. Your Affiant believes that given the continuing nature of financial crimes, as well as the large volume of documents related to business finance, there is probable cause to believe that evidence of violations of federal law, including, but not limited to, 18 U.S.C. § 641 (theft or embezzlement of federal property); 18 U.S.C. § 666 (theft from a program receiving federal funds); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1956 (laundering in monetary transactions in property derived from specified unlawful activity); and 18 U.S.C. § 1957

(engaging in monetary transactions in property derived from specified unlawful activity), will be present in the SUBJECT PREMISES as described in Attachment B, and on the person of PHILLIPS, as described in Attachment A, when the search is conducted. Thus, even if PHILLIPS uses an electronic device (such as a laptop or a mobile smart phone) to access the Internet and digital records of RVCDS, her own financial records, or the records of Attitude Aviation, there is probable cause that evidence of this access will be found in the SUBJECT PREMISES in addition to being on her person and devices seized.

## BACKGROUND ON SEIZURE AND SEARCH PROCEDURES FOR ELECTRONIC DEVICES AND DIGITAL EVIDENCE IN RELATION TO FRAUDULENT BUSINESS INVESTIGATIONS

78. As described further in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B), of any device belonging to or used by PHILLIPS, or where ownership cannot be determined.

79. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months

or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media, in particular, computers' internal hard drives, contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

80.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of

their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about when the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can

indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer

55

user. Lastly, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. I know that when an individual uses a computer to complete illegal financial activities, the individual's computer will generally serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because

it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of a crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

81.     In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described

in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

82. Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime —

including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

83.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

84.    Your Affiant recognizes that Attitude Aviation is a functioning company with several employees and that a seizure of Attitude Aviation's computers and other electronic devices or mediums may have the unintended effect of limiting the company's ability to provide service to its legitimate customers. In response to these concerns, your Affiant offers that the agents who execute the search warrant anticipate taking an incremental approach to minimize the inconvenience to Attitude Aviation's legitimate customers and to minimize the need to seize equipment and date. It is anticipated that, barring unexpected circumstances, this incremental approach will proceed as follows:

a.    Upon arriving at the Attitude Aviation premises, the agents will attempt to identify a system administrator of the network, or other knowledgeable

employee, who will be willing to assist law enforcement by identifying, copying, and printing out paper and electronic copies of the items described in the warrant. The assistance of such an employee might allow agents to place less of a burden on Attitude Aviation than would otherwise be necessary.

b. If the employees choose not to assist the agents, the agents decide that none are trustworthy, or for some other reason the agents cannot execute the warrant successfully without themselves examining the computers, the agents will attempt to locate the items described in the warrant and will attempt to make electronic copies of those items. This analysis will focus on things that may contain the evidence and information of the violations under investigation. In doing so, the agents might be able to copy only those things are evidence of the offenses described herein, and provide only those things to the case agent. Circumstances might also require the agents to attempt to create an electronic "image" of those parts of the computer that are likely to store the things described in the warrant. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing and removing the computer hardware. The agents or another technical expert will then conduct an off-site search for the things described in the warrant from the "mirror image" copy at a later date. If the agents successfully image the computers, electronic devices and other electronic mediums, the agents will not plan to conduct any additional search or seizure of those devices.

c. However, in the event that imagining proves impractical, or even impossible for technical reasons, the agents will seize those components of the company's computer system that the agents believe must be seized to permit the agents to locate the things described in the warrant at an off-site location. The seized components would be removed from the Attitude Aviation premises. If employees of the company so request, the agents will, to the extent practicable, attempt to prove the employees with copies of data that may be necessary or important to the continuing function of Attitude Aviation's legitimate business. If, after inspecting the computers, the analyst or agents determine that some or all of the equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

d. If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer devices will be seized for a period not to exceed thirty days and transported to an appropriate law enforcement laboratory for review. The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

## BIOMETRIC ACCESS TO DEVICES

85. This warrant permits law enforcement to compel Ruth Marie PHILLIPS to unlock any DEVICES requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follow:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-

facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f. As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the DEVICES subject to search under this warrant currently

is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the DEVICES, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for eight hours *and* the passcode or password has not been entered in the last six days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h. Due to the foregoing, if law enforcement personnel encounter any DEVICES that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Ruth Marie PHILLIPS to the fingerprint scanner of the DEVICES found at the

PREMISES; (2) hold the DEVICES found at the PREMISES in front of the face of Ruth Marie PHILLIPS and activate the facial recognition feature; and/or (3) hold the DEVICES found at the PREMISES in front of the face of Ruth Marie PHILLIPS and activate the iris recognition feature, for the purpose of attempting to unlock the DEVICES in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that Ruth Marie PHILLIPS state or otherwise provide the password or any other means that may be used to unlock or access the DEVICES. Moreover, the proposed warrant does not authorize law enforcement to compel Ruth Marie PHILLIPS to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the DEVICES.

## CONCLUSION

86.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

87.     I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a

list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

## REQUEST FOR SEALING

It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. Your Affiant believes that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness. .

Respectfully submitted,

MICHAEL MOYER
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn-to by the Affiant telephonically in accordance with the procedures of Rule 4.1 of the Federal Rules of Criminal Procedure, on ___April 1, 2021___, 2021.

CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA